May it please the Court, Counsel. There are two issues in this case. The first issue is whether a claimant who is seeking additional medical treatment Yes, what did you state your name for the record? I'm going to transfer comments for the petitioner. Thank you. is whether the claimant seeking additional treatment prolongs his medically stationary date. The judge and the Benefits Review Board both held that it did. The law at the time of filing the briefs was pretty strong that it did not. A year ago, this Court in a case, SSA Terminals v. Carrion, which I cited in a 28-J letter to the Court several weeks ago, held specifically, I believe, settled this issue on a permanent basis. I hope that the prospect of future treatment does not extend a claimant's medically stationary date, and that, in my opinion, applies directly to this case because for an additional 13 months, the primary care doctor, Dr. Silva, was referring Michael Dalton to several additional doctors to see if additional treatment might be appropriate, and it wasn't, and he never received any treatment. I read the statement that the primary care doctor made, and it was anything but definitive in February of 2003. His symptoms, I believe, have plateaued somewhat. That doesn't sound like he's reached a point where, from excitement, no further improvement is indicated. It seemed to me that there was an intermediate date that made sense, which was the November date, November 4th. Then the statement was more definitive. Dalton was probably reached a point of some medical improvement, and I know it took time afterwards to confirm that through the other two physicians, but is it your better argument that November is the date, not February? Because, especially watching that the statement he makes is not definitive at all in February, it doesn't indicate to me that he's reached a point of. Well, Dr. Silva testified that, in retrospect, looking at Mr. Dalton's overall situation, that February 2003 was the date when he reached maximum medical improvement. But he stood up for further tests, and he saw a neurologist, he saw a number of other physicians after that, all designed toward improving him, making him better at that point. Why would he have done that if he thought there was no use to it? Because he felt, I think the record is that he felt badly that Mr. Dalton could not improve more, and he wanted to take another stab and see if other things could be done. So he sent him to the neurologist. The neurologist said, I can't, there's nothing I can do for him. Maybe a neurosurgeon might have an idea. So it took another six months for him to get in, another seven months, I believe, to get into the neurosurgeon. The neurosurgeon said, there's nothing further I can do. Surgery is not appropriate, another surgery is not appropriate. And then Dr. Silva says, well, let me send you to two more doctors and see if they can come up with anything. And they didn't. So, essentially, he hadn't improved. And one of the things the judge said is a doctor can't go back retrospectively. But I've been practicing law a long time, and as long as I've been practicing law, doctors have gone back retrospectively and said, let me look at the overall situation. This person was medically stationary years before. And I would venture to say for 100 years before I've been practicing law, doctors have been doing that. But our task is to determine whether or not there is substantial evidence to support the decision. So why isn't there substantial evidence in the appeal of those additional referrals to support the case that was determined by the agency? I don't agree that the standard of repeal is whether there is substantial evidence to support it. I think the standard of repeal is de novo. And I cited the U.S. versus Makani case in the brief, where the question is, what is the focus on? Is it focused on a factual issue, or is it focused on a legal issue? And in this case, I think it's focused on a legal issue, namely, does the seeking of additional treatment, additional treatment options, does that prolong the medically stationary day? And the question, I think this court answered that in the carry-on case, that it does not. The other thing I would point out is... Generally, it's interpretations of the statute. So you think this is an interpretation of the statute that's repealed de novo, instead of for substantial evidence? Well, I don't think it's a statute or interpretation. I think it's a case law interpretation. There's nothing in the statute. The statute just says, you know, when the claimant is medically stationary, then they get the cost of living. Right. But the determination of when a claimant is medically stationary isn't dependent on the facts. It does depend on the facts, of course. But in this case, the question is, the facts are agreed upon, that Mr. Dalton had surgery in January of 2002. He plateaued in February of 2003. The doctors saw that the primary care doctor then referred him to other doctors to see if additional treatment would be helpful to him. And all of the doctors concurred that there would be no additional treatment. The MMI date seems to still be in question. It doesn't seem that the parties agree on that. Judge Goldwater and then in Hawaii, Stephen Orr is at 608 Fifth Third 642, where he says the MMI date is a question of fact, that the ALJ determines from the medical evidence. He cites Container Stephen Orr versus Director of Office of Orphanage, 935 Fifth Second. It seems like it is an issue of fact. It's not agreed to here. So I think, isn't Judge Rollins right, that it has to be looked at in terms of substantial evidence to support the ALJ's finding? No, I don't agree with that. I think because I think the focus in this case is on a legal issue, namely, does the seeking of additional treatment extend the medically stationary date? That's a legal issue, and there's no dispute factually that Mr. Galton was seeking additional medical treatment all the way from February of 2003, excuse me, until March of 2004. And it's also undisputed that none of the doctors had any suggestions for any further treatment. So I don't approve that. And, counsel, if we disagree with you and determine that substantial evidence is the appropriate standard, do you lose? Well, I think the question is, the question is, if you look at the Stephens case and the Ogata case, the Hawaii Stephen Orr case that you just mentioned, the question is, did Mr. Galton reach maximum healing? When did he reach maximum healing? And that, again, goes back to Dr. Soga's opinion, February of 2003, that this is where he reached maximum improvement, because sending him around didn't improve him at all. Well, if there's evidence in the record to support the determination of the board, then under substantial evidence, even, you would lose, wouldn't you? I don't think so. I think even under that, the question is, Dr. Soga's opinion is really the one that, it's the only one that has any medical support, because he didn't improve after going around to see these other doctors. This is also a situation where he had surgery in January of 2002, and it was 13 months after the surgery that Dr. Soga felt, you know, you've gotten, you've plateaued, but I'll send you around to other people. And the treating doctor had released him two or three months after the surgery and said, you know, if you get worse, come back. But how do we know whether or not the claimant has healed to the fullest possible, unless you exhaust all of the possibilities for treatment? Because he didn't get any additional treatment. But how do you know that unless you've referred him? If he's never referred for examination, for potential future treatment, how would we ever know that no additional treatment is indicated or is available? You wouldn't know that until all the additional treatment has been explored. Right. It's like the carry-on case where the claimant, the doctor said, Mr. Carry-on, you're going to need a knee replacement sooner or later. And then six years later or seven years later, the insurance company sends him to two doctors, and both the post office say you're going to need a knee replacement. But this court held that that does not extend the medically stationary date. And it seems to me that my actual distinction is so there's no such definitive determination in February 2003. That's the problem. It's not like he's being told you're going to need this, or it's clear this is going to happen. It really is symptoms I believe have plateaued somewhat. That leaves open the idea that he can further improve. And then the doctor sends him to a neurologist. I understand your point. It's clear a neurologist is just confirming something. But that doesn't seem to be the state of affairs as of February 2003. It seems like there's still an open possibility that he's going to improve. I think in February of 2003 a good argument could be made that we don't know if he's medically stationary at that time. But by the time he refers Mr. Carroll to all the other doctors, and all the other doctors have evaluated him and said there's nothing further we can do, I think at that point Dr. Silva goes back and says, On hindsight, in retrospect, February 21 of 2003 was the point where he healed to the fullest. And that's what the standard has always been with this court, or any of the courts, that once the claimant is healed to the fullest, that's when he's medically stationary. Is there a case that... Go ahead. If I can just interject at some point, I would appreciate it if you would address the average weekly wage issue, because it seems like the argument thus far is only focused on maximum improvement data. And I'm at least interested in the wage issue. The wage issue, what the judge did in this case, is he took the last eight quarters of Michael Dalton's work history, or his earnings records, and used them as an average to be representative of his wage earning capacity. Four of those quarters were the worst year the company had in 13 years. In fact, it was one of the two years in the 13 years that the company did not make a profit. And he used 50% of his wage earning capacity. He used another quarter, which was part of the company's second worst quarter. And there's simply no basis in the record, much less a substantial basis, to say that this is representative of Michael Dalton's wage earning capacity over taking out books. Counsel, do you believe this is your best case? I would suggest that they had to take a broader sampling or longer period of wages to determine the average. Well, I don't think, you know, this is definitely a fact question. I don't think had those two years been average years for the company, I think it would have been appropriate for the judge to say these two years are representative of his wage earning capacity, but not when you take the worst year the company ever had. In fact, in 2000, as the court may recall, there was a dot-com stock market crash, and the cruise industry just went through the floor in terms of people booking vacancies. What period of time did you contend they should have used? I think they should have used the time after his apprentice year, the two years plus the third year that he was working, and then adjusted by the change in the company's gross receipts for the next nine or ten years that we had. The evidence was undisputed that the gross receipts, that workers' earnings or hours, work opportunities, are proportionate to the gross receipts of the company. The president testified to that. The accounting manager had been the accounting manager for about 17 years, testified to that, and the ALJ really had no basis to say that that was not appropriate. But the ALJ has broad discretion in determining the average weekly rent wage, and he could have determined it using your methodology, but was he required to do so? I think he has to have substantial support in the record to support the average weekly wage. And the question is, would a reasonable mind accept these last two years as representative of a worker's wage earning capacity? And you take the worst year the company had, that was about two-thirds of their average for a 13-year period. There's no way that that could be represented. Well, but he had worked sporadically and intermittently, so why wouldn't it be within the ALJ's discretion to consider it because his work history was sporadic and intermittent, that in the last two years, his employment represented, fairly represented his wages? It wasn't representative. It wasn't representative. You know, you think that, but why was it within the ALJ's discretion to make that choice? The ALJ has discretion, but they don't have, the ALJ does not have unlimited discretion. It has to base it on the evidence, or at least something in the evidence. Based it on the wages, on the wages for the last two years. But those wages, there's no basis to say that they were representative of the company's history. Before you sit down, I'll give you a minute for a moment. I wanted to ask you, is there a case that supports your position that a doctor may retroactively opine as to the date when maximum yielding has occurred? Is there a court case that supports your argument that a physician may retroactively opine as to the date that maximum yielding has occurred? Yes, Hawaii Steven Horse v. Ogawa says that. In fact, the court went back and approved the date by Dr. Keller. That was, I think, a couple of years before he examined the patient. Anything else? I'm going to please the court. I'm Norman Colom, representing the employer and carrier. The appellant several times has cited Steven Horse's director from the Ninth Circuit, the statement, maximum medical improvement is attained when the injury is healed to the full extent possible. But that citation is incomplete. If you look at page 1259 of that same statement, there the court says that a disability remains temporary so long as there was a possibility or likelihood of improvement through normal and natural healing. The appellant here wants to write out from this concept the idea of a possibility of healing. Now, that section, page 1259 from Steven's case, was referenced specifically in the Castro case, General Construction of Computers Castro by this court, quoting from page 1259. The carrion case, which I believe is distinguishable on its facts from any circumstance that we have here, also references, cites the Castro case, the same reference that at least Steve Horse, which is a gala, also cites Castro. So there you have essentially four cases that are incorporating in the concept of maximum medical improvement, the notion that a possibility of improvement may keep the worker from reaching maximum medical improvement. Now, that covers the situation, for example, when a doctor says, you have all this physical therapy for your low back, but I think you might have a herniated disc. I want you to have an MRI. I want you to see a neurosurgeon. So they set up the MRI. He sees the neurosurgeon. The neurosurgeon says, well, I don't really think you're a surgical candidate. In that period of time, until that additional evaluation is done, that worker has not reached maximum medical improvement, because there is still the possibility of improvement if that examination demonstrated some other line of euphoria for treatment. So why doesn't that date here go back to November, the intermediate date between February and March? It seems like as of November, its personal position is giving up the hope that it's going to improve, and then it's validated. And I'm assuming it takes some time to set up the appointments, but that shouldn't accrue against him, right? Well, maybe a different judge on a different day might have picked that day, but in this particular case, there's evidence to support the subsequent date, because in that period of time that we're talking about, the attending physician had referred him to the OHSU Pain Management Center for an evaluation. He was referred to Dr. Nutt, who's a neurologist, then cervical MRI, then to a neurosurgeon, Dr. Chestnut, and finally to a family medicine physician, Dr. Lundstein, who did a physical analysis evaluation for his non-cognitive matters, and Dr. Lundstein, an expert in brain injury, who did the final evaluation for his cognitive dysfunction. All that took time. All that was recommended. When that was done, then he reached maximum medical improvement. That's supported by the record. I'd like to note as well that there is a second definition of maximum medical improvement, which Counselor didn't mention in oral arguments, but we did in the brief, based on Watson v. Goff, a Stevedore company. That covers a situation that's from the Fifth Circuit, and that covers a situation where a worker has reached that point of being medically the best he can be, but the disability has lasted for such a long time, it won't change that he might be deemed to be at maximum improvement. So that covers a situation, for example, of a quadriplegic who may be in and out of the hospital all the time because one organ system or another is failing, always getting treatment, but the disability is never going to change. It's going to be long lasting. And that may entitle a trier to say, well, you've reached maximum medical improvement under that particular standard. All right. That case, that was not the basic decision before the ALJ. That was not the basic decision at the BRB. It was not argued by the claimant before the ALJ or the BRB. It's really not ethical, but I mention it because it was because of the brief. The counsel says, oh, it's also ethical here. These are one or the other. It can't be both. And the interesting thing as well is that this being a Fifth Circuit decision, it's also the same circuit that decided the MEPI and the Lewis County Energy Association Bush's Habit case. We specifically held that it is inappropriate to do this retrospective kind of evaluation. They said if a physician believes further treatment should be undertaken, a possibility of success exists even if, in retrospect, it was unsuccessful. Maximum medical improvement does not occur until the treatment is complete. That's what happened here. That's compatible with the test that this court has ratified through those four decisions that I mentioned, Stevens, Castro, and the others. The counsel is asking you to change the law and eliminate part of this formula, to eliminate the concept of possibility exists and only look at whether, in fact, retrospectively, change has occurred. That would be different. That would be contrary to the Fifth Circuit, for sure, and I think contrary to this circuit's evaluation of decisions that have preceded this date. Now, facts, and maybe you would call that a question of law, but there's no reason why this court should change existing law. Therefore, it is a question of fact, and there is support. There is medical evidence in the records to support the finding that the judge made about that. I'm sure he did not reach maximum improvement until all those tests and evaluations had been done. With respect to average weekly wage, you know what it says. It first says, well, the goal is to predict accurately as possible what the claimant would have earned had he not occurred. Now, the goal is to determine the average weekly wage, the earning capacity, at the time of injury. In ordinary, we would look backward from the time of injury to determine what the earning capacity is, and there are occasional cases when it may be appropriate to look forward at what the worker would have earned or could have earned in some extraordinary situations. Here, how far backward did the LJ look? In this particular case, the judge went two years from the date of injury to assess an indication of earning capacity. Now, speak to that in terms of the... So my question, I guess, somewhat bothers me is, why would a two-year period be reasonable under circumstances where one of those years is, you know, like the worst year in the history of the company? It's within the judge's discretion to consider that period as representative of earning capacity, and the contrary evidence that is proposed that it wasn't representative because the change in the gross receipts would have rendered that an inappropriate period to consider. That's not supported by the evidence. The appellant has cited or said several times that the gross receipts are directly proportional to the claimant's earnings. Not true. First, this company that does business in Thailand, in Florida, in lots of places around the world, and the fact that they have receipts from their worldwide organizations does not translate dollar to dollar to dollar to what the claimant might earn. In fact, if you look at, we have records of what his earnings are for several years, and supplemental exits for record one to three, and we have information in the file as to what the gross receipts of the companies were. If we start, if we look, for example, between 1997 and 1998, the change between that, the claimant's earnings increased 129 percent while the company's earnings went down 6 percent. The next year, 1998 to 1999, the appellant's earnings increased 5 percent, whereas the company's gross receipts went up 18 percent. The next year, 2000, between 1999 and 2000, his earnings went down 49 percent, the company's gross receipts went down 35 percent. They both went down. It's not a one-but-one. I want to directly correlate to you. Chancellor, if I could ask you a question. I'm not sure how precise the correlation is, all those two things, but are you aware of what his average wage would have been if you went back, if the ALJ had gone back five years, let's say, rather than two years? I didn't make those calculations. Actually, at the hearing level, the appellant was arguing for excluding the first year of his employment, which was his worst year, and excluding his last year and taking all the years in between, but all the case law says that if you're going to look at, that you need to look at least at the earnings before the entry. The judge correctly rejected that notion. In fact, at the hearing, we argue that only one year should be used as a basis of a certain capacity. The judge elected to take two years. In this particular case, two years takes into consideration part of 1999, all of 2000, and part of 2001. In 1999, the gross receipts were $20 million. In 2000, $13 million. In 2001, $14 million. And if you look at the successive history of the gross receipts, you see that they did spike in 2002 to 2002, but after that, it was 15, 20, 21, 15. They fluctuated. So the judge took a two-year average when post-injury earnings really couldn't be the basis for predicting what he would or wouldn't earn thereafter, and that was within his discretion, and he's allowed broad discretion to come up to that, to reach those conclusions. Is my time up? I think my time's up. No, you have three minutes. I've got three minutes. But you don't have to use it. I just want to ask you a question. Okay. Do you agree with the policy council that Hawaii Steve Edores supports the proposition that the determination of maximum medical improvement may be done retrospectively? No, I don't. Hawaii Steve Edores involved a person who was not under treatment for any particular time. Basically, they were trying to figure out when he had reached maximum medical improvement, when no treatment had been undertaken in that period of time. Nobody was asking for evaluations. And it was based on some prediction that he would have achieved a certain date, based on the normal course of time. That's an entirely different kind of a situation than we have here. And it certainly doesn't directly contradict or speak to the habit and decision that says you can't make those retroactive determinations. And the other case that was cited, Hall v. Consolidated, I'm sorry, excuse me, not that case, the Carrion case. There's another person who had not been under any treatment for years. There wasn't any doctor that said, do a total knee replacement today. You should have it right now. All they said was, sometime in the future, you're going to need it. And that was the extent of the evidence that was there. So the court said, well, he was stationary at that time, because we don't know whether he will really need that surgery in the future or whether some other procedure might be better for his treatment. He doesn't speak to the Abbott case, the Gulf Coast, Gulf Best electric case versus Methi. The closest approximation to what we have here, or what the argument that the claimant was making with respect to maximum medical approval is the Gulf Best and Abbott cases, where the court said specifically you can't make this retrospective determination. That's exactly what the claimant is asking you to do in this case, and it would be a departure from existing law. If the court has more questions, I'll leave it at that. Thank you. It appears not. Thank you, counsel. Thank you. I believe that counsel is wrong on the O.I. Steven Ortiz, and I discussed that on page 22 of the brief. The other issue is the first year that Mr. Dalton worked for the employer, it was an apprentice year. The project managers didn't know him. He didn't know the work. After about nine months, they started to know him, and that's when his work picked up dramatically, and that's why the judge did not have use that first year. But the other years were he was averaging almost 50 hours a week of work the next two years, and his average for the last nine months of 2000 dropped to under 20 hours a week, and the evidence is that he never turned down work. So the work opportunities really affected him a great deal in this case. The other thing I would say is on the Carrion case, the court specifically said evaluating an individual's condition based on presumed effect of a theoretical future treatment makes sense, and Carrion specifically held that the prospect of future treatment does not extend a medically stationary date. The question is when did he heal to the fullest? In both the Methy and Abbott case, there was continuing treatment going on before the doctors found that the claimants were medically stationary. In this case, there was no treatment. It was the prospect of future treatment. We understand your argument. Thank you, counsel. Thank you. Thank you to both counsel. In case this bar can be submitted for a decision by the court that completes our calendar for the day, we are in recess until 930 at 8 a.m. tomorrow.
judges: Gould, Rawlinson, Burns